**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**


VICKIE R. BUMPERS TILLMAN,      :

     Plaintiff,          :

vs.                    :   CA 13-0440-C

CAROLYN W. COLVIN,        :
Acting Commissioner of Social Security,
                         :

     Defendant.


## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 14 & 16 ("In accordance with  provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of plaintiff's counsel at the April 30, 2014 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 14 & 16 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

Plaintiff alleges disability due to migraines, degenerative disc disease of the lumbar and cervical spines, herniated disc at L5-S1, hypertension, anxiety disorder, depression, and panic disorder with agoraphobia. The Administrative Law Judge (ALJ) made the following relevant findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since September 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: migraines, degenerative disc disease of the lumbar spine and cervical spine, herniated disc at L5-S1, hypertension, anxiety disorder, depression and panic disorder with agoraphobia (20 CFR 404.1520(c)).

.     .     .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

.     .     .

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of sedentary work as defined in 20 CFR 404.1567(a), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific physical capabilities during the period of adjudication have been the ability to sit for 6 hours out of an 8-hour workday; stand for 2 hours out of an 8-hour workday; walk for 2 hours out of an 8-hour workday; remain in the same position for 1 hour before needing a position change of at least 10 minutes before returning to the initial position, but could continue to work through this position change; lift/carry up to 10 pounds frequently; push and pull arm and leg controls occasionally; and stoop, kneel, crouch, crawl, balance and climb ramps/stairs occasionally. The claimant could work in a job that would not require her to climb ladders, ropes or scaffolding; or work at unprotected heights or around hazardous machinery. The claimant's specific mental capabilities during the period of adjudication have been the ability to perform simple, routine, repetitive tasks; maintain attention and concentration for 2 hours at a time; have brief, superficial contact with [the] public; work in close proximity to others, but would

**need to work independently; and adapt to infrequent/minimal changes in [the] workplace.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

.     .     .

At the hearing, the claimant testified that the main thing that keeps her from working is back problems and leg problems. She has been treated by Russell Hudgens, MD, an orthopedist, who has discussed surgery as a treatment option. She has been treated with medication, Toradol injections, blocks and physical therapy. The claimant said she has muscle spasms and difficulty sitting, standing and walking for a period of time due to numbness and tingling in her legs and feet. She said she can sit for about 30 minutes at a time before having to get up and move around, for up to 2-3 hours out of an 8-hour workday. She said her knee cramps immediately when walking, sitting or standing. The claimant said she cannot bend over or stoop.

.     .     .

The claimant said she has some good days and some bad days. When asked if she could maintain concentration to watch a television show, she said yes; but she also said it is hard for her to sit still, as she has to have a pillow. The claimant stated that she does not think she could work with the side effects she experiences from all of her medications. She said

Klonopin, Lortab and Flexeril make her drowsy; and she sleeps for 3-4 hours during the day.

When asked about her daily activities, the claimant said she is not able to do many activities. She said she tries to elevate her feet and has changed her mattress to try to get relief. The claimant said she has not driven since last year because her medications make her feel "drunk, dizzy and out of sorts."

.    .    .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

.    .    .

The claimant has been treated by Dr. Hudgens since September 29, 2008, for lumbar pain/strain. X-rays of her lumbar spine at that time were normal for her age. She was treated with physical therapy, injections, Flexeril, Lortab and Ibuprofen. On September 30, 2008, Dr. Hudgens said the claimant should not lift over 10-15 pounds for several weeks. Dr. Hudgens completed a Medical Certification Form on October 21, 2008, stating that the claimant had a serious health condition covered by FMLA, consisting of lumbar strain/lumbar pain. He said the claimant's condition met the criteria because she was to attend physical therapy for two weeks. Dr. Hudgens noted the claimant would need to intermittently take leave as a result of this condition, but was not presently incapacitated due to the identified condition.

Dr. Hudgens wrote a letter on May 29, 2009, stating that he was treating the claimant for left knee chondromalacia and lumbar strain times 6 months. He noted she was then being treated with the appropriate medications for pain, muscle spasms and inflammation, which she was to take on an as needed basis. Dr. Hudgens stated, "I feel her prognosis is good at this point of treatment."

The claimant underwent an MRI of the lumbar spine on September 28, 2009, which showed a mild broad-based subligamentous herniation at L5-S1 with mild foraminal encroachment bilaterally; a subtle bilobed bulge of L3-4 with borderline narrowing to the origin of each exiting foramina; and a mild annular bulge of the L4-5 disc creating borderline narrowing to the origin of the exiting foramina. On October 1, 2009, Dr. Hudgens reviewed the MRI[] and interpreted it to show some ligamentous disc herniation with degeneration at L5-S1 and minimal nerve encroachment. He ordered

an epidural[] and renewed her Flexeril, Lortab and Soma to be used as needed for severe pain.

Dr. Hudgens completed a Reasonable Accommodation Request for the claimant on October 5, 2009, stating that she needed an ergonomic back support chair due to lumbar pain and disc herniation. He said she needed this accommodation to better support her back to minimize pain during the workday. Dr. Hudgens also wrote a letter on the claimant's behalf on October 5, 2009, stating that he had been treating the claimant for chronic lumbar complaints for over a year. Dr. Hudgens said a recent MRI scan revealed that she has a disc herniation in her lumbar area. Due to these problems and continued complaints, he felt she needed a good supportive lumbar chair that is more ergonomically designed for her prolonged sitting during the workday.

The claimant complained of a slight flare-up of pain in her low back to Dr. Hudgens on October 16, 2009. He noted the flare-up occurred following her epidural block on October 8, 2009, by Charles Hall, MD, a[n orthopedist]. She said she had difficulty working a couple of days that week and did not report to work on the day of the exam. The physical exam showed tenderness across the lumbosacral area and minimal pain on straight leg raise testing. No focal motor or sensory deficits were noted in the lower extremities. He gave the claimant a Toradol injection and Flector patches, and continued her on Flexeril and Lortab. He gave her a note stating she was off on October 13 and 16, 2009.

On November 6, 2009, the claimant told Dr. Hudgens that her lumbar pain had improved. She said the pain was around 5-6/10 on the pain scale (0 = no pain, 10 = worst possible pain) on most days; and she was able to function fairly well with intermittent discomfort in both legs. The physical exam revealed minimal pain reported on straight leg raise testing. No focal motor deficits in the lower extremities were noted; and minimal tenderness was present across the lumbosacral area. Dr. Hudgens refilled her Flexeril[] and noted she still had Lortab to take as needed for mild-to-moderate pain. He told her to continue with lumbar flexion exercises.

Dr. Hudgens completed another Medical Certification Form for FMLA leave on November 25, 2009. He noted the claimant would need to attend follow-up treatment appointments because of her medical condition[] and estimated that her treatment schedule would consist of physical therapy on an as needed basis. Dr. Hudgens said it was medically necessary for the claimant to be absent from work during the flare-ups due to her chronic lumbar condition that causes difficulties for sitting or standing during long periods of time.

The claimant returned to Dr. Hudgens on April 2, 2010, for a flare-up of pain in her lower lumbar and pain in both legs equally, mostly in the thigh area. She said she had been trying to do some walking and some weight reduction, which slightly irritated her lower back. On exam, she

had mild discomfort with straight leg raise testing, more on the left than the right, with no sciatic stretch signs. No focal motor or sensory deficits were noted. Dr. Hudgens assessed her with lumbar degenerative disc disease at L5-S1, lumbar pain and possible lumbar radiculopathy. He refilled her Flexeril and Lortab 7.5 mg, and switched her from Mobic because of headaches to Voltaren.

The claimant was seen in the emergency room on September 10, 2010, for a headache and high blood pressure. Her blood pressure was recorded as 170/121 upon presentation. The claimant also had minimal tachycardia at 102. The physical exam showed her chest and back was symmetrical and nontender. Her lungs were clear to auscultation with no rales, rhonchi or wheezes. Her heart had a regular rate and rhythm with no murmurs, rubs or gallops. Her extremities had full range of motion with no bony tenderness. The neurologic exam showed that she was alert and oriented. The cranial nerves showed no evidence of any focal weakness. There was excellent strength versus resistance to both upper and lower extremities. Deep tendon reflexes were 2+ and symmetrical. The CT scan of the head was totally normal. . . . She was assessed with hypertension and hyperventilation secondary to hypertension.

The claimant was initially evaluated by Dr. Burch on September 13, 2010, for an exacerbation of high blood pressure over the last week. The claimant told Dr. Burch that she woke one morning last week with a terrible headache and some numbness and tingling. She checked her blood pressure, which was high despite being on Avalide. The claimant said she took her medication and went to work; but she ended up going to the emergency room for a headache, numbness and tingling and visual disturbances. The emergency room physician prescribed Hydralazine and Hydroxyzine; but the claimant said she had not taken any of this medication. Dr. Burch noted that on further discussion, the claimant related that she had been having a terrible time at work. She was stressed out, as her workload was increasing due to a reduction in the number of social workers in her office. On physical exam, her blood pressure was 150/94. . . . Dr. Burch assessed the claimant with uncontrolled hypertension and anxiety. She told the claimant to increase her Avalide dosage[] and gave her a work excuse for the week. She also gave the claimant a prescription for Lexapro. She told the claimant to talk to her supervisor at work; but the claimant said she was actually looking for a different position within the state system.

The claimant followed up with Dr. Burch on September 17, 2010, and reported that she was still feeling bad and still had a headache. She was taking her Lexapro[] and reported she continued to take it despite a "little bit of nausea." Dr. Burch noted the claimant forgot to increase her Avalide dosage, so her blood pressure was still up. She said the claimant had not gone back to work[] "and her job continues to hassle her." The claimant reported that she remained stressed because her employer kept calling her at home and "begging" her to come back to work. The claimant told Dr.

Burch that she wanted to "stay out a little bit longer because she doesn't feel like she can function in that environment." On physical exam, Dr. Burch noted, "She does look like she feels bad today." . . . Her blood pressure was 160/100. Dr. Burch assessed the claimant with uncontrolled hypertension, headaches secondary to uncontrolled hypertension, anxiety secondary to workload and upper respiratory infection (URI). She increased the claimant's Avalide and Lexapro dosages[] and gave her a Z-pak

Dr. Burch completed a Doctor's Certificate for FMLA leave on September 17, 2010, and noted the claimant's condition commenced on September 13, 2010. She said the claimant will need to have treatment visits at least twice per [month] due to her condition; and medication was prescribed. Dr. Burch said the claimant was unable to perform "any and all" of her job functions due to her condition. She said the claimant had uncontrolled hypertension causing symptoms of fatigue, headache and paresthesias. She said the claimant's symptoms have been aggravated by stressful work conditions, "i.e., unrealistic workload." Dr. Burch said the claimant was incapacitated for a single continuous period of time due to her medical condition, beginning on September 13, 2010 to an undetermined date. However, Dr. Burch then indicated that the claimant would have to attend follow-up treatment appointments every 2 weeks until she improved. When asked if it was medically necessary for the claimant to be absent from work during the flare-ups, Dr. Burch said "possibly – will need to evaluate[] at each exacerbation."

The claimant's blood pressure check in Dr. Burch's office on October 1, 2010, showed that it was better at 130/80. The claimant told Dr. Burch that she had been taking her increased Avalide dosage; but her blood pressure was "bottoming out to about 100 to 104 systolic and she was quite weak" so she went back to the old dosage. She said her blood pressure was still going up in the afternoon a couple of days a week, so she was taking a second dose "just not every day." . . . The claimant had been out of Lexapro for 2 weeks[] and she had not noticed that it had done anything for her. Dr. Burch noted the claimant's blood pressure was 142/104 when she checked it. Dr. Burch assessed the claimant with uncontrolled hypertension . . . [and] continued the claimant on Avalide with once a day dosing, but noted she could take the second dosage as needed. She increased the claimant's Lexapro dosage[.] . . . Dr. Burch [] wrote notes that the claimant was medically unable to work from September 17, 2010 through October 1, 2010 and then from October 1, 2010 through October 17, 2010.

Dr. Burch wrote a letter on October 4, 2010, stating that the claimant has hypertension that has been exacerbated as of late due to stressful work conditions. This led to an episode of hypertensive urgency on September 10, 2010, which required a visit and treatment in the emergency room. Dr. Burch reported that in the 3 weeks since that time, she had been struggling to get the claimant's blood pressure under better control and to

treat her for anxiety. . . . Dr. Burch stated that the claimant was not able to perform her activities at work until her blood pressure and stress level are under control. If her condition is not successfully treated, it could result in a stroke, myocardial infarction or even death. Dr. Burch wrote, "Please consider this in making decisions involving her employment, etc."

.     .     .

The claimant returned to Dr. Burch for follow up on October 15, 2010. Dr. Burch noted the claimant had hypertensive urgency that was probably stress related. Her blood pressure had been doing a little better[] and she was only having to take a second dose of Avalide 2-3 times a week. . . . Her blood pressure was better at 130/90. Dr. Burch assessed the claimant with labile hypertension, anxiety with depressive symptoms[,] and migraines. . . . She gave the claimant a note to be off work through December 6, 2010, which was enough time to complete the 8-week psychiatric program.

Dr. Burch also completed a Doctor's Certificate for the claimant's unemployment benefits claim on October 15, 2010. Dr. Burch reported the claimant was to be treated for uncontrolled hypertension and anxiety/depression from September 13, 2010-December 6, 2010. Dr. Burch said the claimant is not able to perform the duties of her usual occupation or any type of work.

.     .     .

The claimant returned to Dr. Burch for follow up on November 12, 2010. . . . Dr. Burch said the claimant and her husband inquired about filing for permanent disability, as she had decided to resign from her job but "apparently she does not have enough years with the state to get medical disability through the state." Dr. Burch said the claimant's blood pressure was "great today." She counseled the claimant on being compliant with taking Lexapro. Dr. Burch told the claimant she could seek information about Social Security disability; but she said, "I believe that she needs to give herself more time with the treatment program before she makes that decision." She noted if the claimant decided to file for disability in the future, "it is going to be joint with the psychiatrist as well because I do not think her hypertension alone is going to be enough to warrant permanent medical disability." The claimant's blood pressure was also "great" at her December 2, 2010, follow up with Dr. Burch.

.     .     .

The claimant saw Dr. Hudgens on January 14, 2011; and he noted the claimant had been doing fairly well until over the Christmas holidays when she had increasing pain in her lower back into her right hip and leg. On exam, she had mild pain on straight leg raise testing on the right side and negative on the left. No focal motor deficits were noted; and no sciatic

stress signs were present. He noted an MRI from August 2009, showed a right lumbar radiculopathy. He assessed the claimant with lumbar degenerative disc disease at L5-S1 and lumbar pain. Dr. Hudgens said at that point, she had gotten relief in the past with medication including Flexeril, Lortab 7.5 mg and Voltaren with gastrointestinal and hypertensive precautions. He told the claimant to follow up if symptoms are not medically controlled.

On February 10, 2011, Dr. Burch noted the claimant reported that her blood pressure had been fluctuating high to low over the last few weeks; and she had become very tired over the last 2 weeks. The claimant said she had been walking 3 nights a week, but had cut back on her walking because she was having some chest tightness that resolves when she stops exercising. . . . The claimant complained of achy joints, primarily in her hands and feet. She said the joints swell sometimes; and Dr. Hudgens had put her on Voltaren, which had helped her some with the swelling and pain. On physical exam, her blood pressure was 138/90. The exam was normal, except there was some tenderness in the hands without swelling or synovitis. The knees and ankles were normal; and the neurological exam was nonfocal. Dr. Burch assessed the claimant with chest pain, labile hypertension, mild hyperlipidemia, anxiety, insomnia, left TMJ, arthralgias and malaise/fatigue. She noted the claimant's chest pain was likely due to anxiety, but she needed to rule out cardiac problems. Dr. Burch also ordered a rheumatoid arthritis (RA) factor and an ANA screening on February 10, 2011, which were negative.

The claimant had an EKG on February 10, 2011, which was abnormal with findings of a possible anterior infarct, age undetermined, and nonspecific inferior/lateral T changes. Therefore, Dr. Burch sent the claimant for a treadmill myocardial perfusion imaging test on February 17, 2011, which was noted to be a probably normal study. There was a medium sized, moderate, predominately fixed defect involving the apical wall suggestive of attenuation artifact; but gated perfusion images showed normal left ventricular function and wall motion with an ejection fraction of 83%. No additional cardiac workup has been undertaken.

.     .     .

The claimant returned to Dr. Burch for follow up on August 15, 2011, for a general checkup and annual wellness exam. Dr. Burch noted her history of hypertension, migraine headaches, anxiety, TMJ and arthralgias. The claimant told her that her blood pressure has been doing fine at home. She has a few elevated readings, but no symptoms. Dr. Burch said it was 130/82 in the office. . . . The claimant had not gone back to work. During the review of systems, the claimant's weight was down 5 pounds. She reported no chest pain, orthopnea or PND; no shortness of breath, cough, wheeze or hemoptysis; no abdominal pain, nausea, vomiting, diarrhea or constipation; and no peripheral edema. The physical exam was normal. . . . Dr. Burch's impression was that the claimant has hypertension,

depression and anxiety, migraine headaches, and complaints of some muscle cramps. . . . She refilled the claimant's Ambien and Diovan, and told her to continue to monitor the blood pressure carefully.

Dr. Hudgens completed an Application for Disability Access Parking Privileges on the claimant's behalf on August 26, 2011. He noted the claimant is severely limited in the ability to walk due to an arthritic, neurological or orthopedic condition; and her condition is a long-term disability. . . .

The claimant saw Dr. Hudgens on September 7, 2011, for a follow up after her August 31, 2011, MRI arthrogram of the right hip, which showed slight edema at the trochanteric insertion of the gluteus medius, but no sign of any obvious labral tear. He noted the claimant said she still had a lot of hip and groin pain on the right side, as well as some mild right leg symptoms. Dr. Hudgens noted the claimant has a known history of lumbar degenerative disc disease at L5-S1 and some improvement with blocks in the past. He assessed her with right hip pain, uncertain etiology; possible referred lumbar radiculopathy; and history of lumbar degenerative disc disease at L5-S1. Dr. Hudgens planned to refer the claimant to physical therapy for her right hip and lumbar area. If she had no improvement, he noted he may reevaluate her with an epidural block at L5-S1. He noted he gave her no new prescriptions.

Dr. Crafton wrote a letter on September 19, 2011, stating that the claimant presented with severe spinal complaints with the most severe being related to the cervical and low back with radiating pain to the right leg and foot. . . . She said the claimant's spinal and extremity complaints relate to trauma, often notable to the cervical spine. She said the claimant's range of motion in the cervical spine was severely reduced to the left and in extension. She had pain in all range of motion positions, increased with distraction. Dr. Crafton said the claimant's cervical spine is very unstable, as evidenced by the normal lateral, flexion and extension radiographic views. She said the claimant had severe listhesis of the vertebral bodies, which is evidence of ligamentous trauma and subsequent hypermobility. Dr. Crafton said the claimant has responded well to chiropractic care, which includes full spinal adjustments and supportive therapies. She also noted the claimant had considerable reduction in long-term spastic cervical musculature. However, she said the claimant is very unstable and requires frequent supportive care. Dr. Crafton stated, "Ironically, care provided through disability claims excludes the chiropractic care that she has received through her husband's Blue Cross contract."

.    .    .

The claimant followed up with Dr. Hudgens on October 11, 2011, and reported that she also had some right knee pain. She told Dr. Hudgens that she had been doing about the same, although she had some mild popping and catching sensation within her right knee. Her right hip

intermittently had improved. She told Dr. Hudgens that she can tolerate this without any additional therapy at this time; and she did not attend physical therapy since her last visit. Dr. Hudgens noted she intermittently has problems with her lower back, but is adequately controlled with Lortab[,] Voltaren [and] Flexeril. On physical exam, there was equivocal tenderness over the medial joint line of the right knee with negative McMurray's test. There was no sign of any restricted movement of the right knee and no effusion. She had minimal discomfort on range of motion of the right hip without restriction and minimal tenderness at the right sacroiliac area. Dr. Hudgens assessed the claimant with lumbar degenerative disc disease at L5-S1; right hip pain, negative MRI arthrogram; and right knee [pain], possible medial meniscus tear. He planned to continue her on her regimen of medications as previously prescribed with Voltaren, Lortab and Flexeril. She was instructed to return for follow up in 3 months; but she came in for a Toradol injection on December 12, 2011.

.    .    .

Dr. Hudgens completed a Clinical Assessment of Pain Form [] on January 4, 2012, and noted the claimant's pain will distract [her] from adequately performing daily activities or work; physical activity, such as walking, standing, bending, stooping and moving of the extremities, would cause some increase in the severity and degree of symptoms, but not to such an extent as to prevent adequate functioning in such tasks; and pain impacts her ability to perform her previous work to the extent that pain and/or drug side effects can be expected to be severe and to limit the claimant's effectiveness due to distraction, inattention and drowsiness. Dr. Hudgens said he had been treating the claimant for lumbar degenerative disc disease, which was confirmed by a September 2009[] MRI. Dr. Hudgens said the claimant's condition will require physical therapy, medication and possible injections in the next year. Dr. Hudgens said the claimant cannot lift over 25 pounds[] and should avoid twisting and bending. Dr. Hudgens opined that the claimant cannot engage in any form of gainful employment on a repetitive, competitive and productive basis over an 8-hour workday, 40 hours a week, without missing more than 2 days of work per month or experiencing frequent interruptions to her work routine due to symptoms of her disease or medical problems.

Dr. Crafton wrote another letter that was submitted into the record on January 10, 2012, and stated the claimant has been treated in her office since December 7, 2010. At her initial examination appointment, she presented with extremely contracted left trapezius, left scalenes, left SCM and paraspinal muscles from C2 through T10. Her cervical range of motion was reduced by 40% on left rotation. The claimant rated her pain at 8/10. Radiographs were taken of the cervical, thoracic and lumbar [s]pine. Upon analysis, her cervical spine showed a loss of normal lordotic curvature. Dr. Crafton said they then took flexion and extension views to determine if there was instability during motion of the cervical spine; and

it was evident on the radiograph that 3 joints were hypermobile during flexion. The extension view showed hypermobility as well; and her range of motion in extension was limited by 20%. Since September 20, 2011, the claimant had been treated in her office on 7 different visits. At each visit, the claimant had both subjective pain and decrease in her activities of daily living. She reported that she and her husband had tried turning their mattress, and had purchased a new one in hopes that her pain would decrease. . . . There were many observable objective findings indicating the same chronic problems with her cervical spine. During that time, the claimant also complained of low back and leg pain. Lumbopelvic radiographs showed some L5-S1 joint problems with the right pelvis being elevated higher than the left. She has problems walking any distance, and after repeated visits over nearly 1 year, Dr. Crafton said she wrote a request for a State of Alabama handicapped parking permit due to her chronic pain and inability to walk very far. The claimant was treated wit Atlas-Orthogonal instrument and the Impulse instrument to realign the cervical, thoracic and lumbopelvic regions of the spine. Myofascial release technique and mechanical traction were utilized to help with the muscle contractions; and therapeutic exercises were added to further relax and rehabilitate the neck and shoulder regions. Dr. Crafton said the claimant showed some improvement in range of motion and reduction of pain at each visit; however, her results seemed short lived and within days her chronic condition worsened again. Dr. Crafton wrote, "I have seldom seen a case that I felt warranted any consideration for disability prior to [the claimant's] request."

Dr. Hudgens completed a Physical Capacities Evaluation [] on January 24, 2012, and found the claimant had the following limitations in an eight-hour workday: sit for 4 hours at a time, for up to 8 hours per day; stand/walk for 2 hours at a time, for up to 2 hours per day; lift up to 5 pounds for 8 hours in an 8-hour workday, 6-10 pounds for 6 hours in an 8-hour workday, 11-25 pounds for 2 hours in an 8-hour workday and 26-50 pounds for 1 hour in an 8-hour workday; carry up to 5 pounds for 8 hours in an 8-hour workday, 6-10 pounds for 6 hours in an 8-hour workday, 11-20 pounds for 2 hours in an 8-hour workday and 21-25 pounds for 1 hour in an 8-hour workday; use both hands for repetitive action such as simple grasping, pushing and pulling of arm controls and fine manipulation; use both feet for repetitive movements as in pushing and pulling of leg controls; and bend, squat, climb and reach for 2 hours in an 8-hour workday and crawl for 1 hour in an 8-hour workday. Dr. Hudgens assigned no restriction involving unprotected heights, restriction involving being around moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment and exposure to dust, fumes and gases. Dr. Hudgens also said the claimant can work 8 hours per day, 40 hours per week on a sustained basis, within the limitations given above, without missing more than 2 days of work per month.

.        .        .

The claimant has degenerative disc disease of the lumbar spine and cervical spine and herniated disc at L5-S1, which results in the limitation on her ability to sit for 6 hours out of an 8-hour workday; stand for 2 hours out of an 8-hour workday; walk for 2 hours out of an 8-hour workday; remain in the same position for 1 hour before needing a position change of at least 10 minutes before returning to the initial position, but could continue to work through this position change; lift/carry up to 10 pounds frequently; push and pull arm and leg controls occasionally; stoop, kneel, crouch, crawl, balance and climb ramps/stairs occasionally; and work in a job that would not require her to climb ladders, ropes or scaffolding or work at unprotected heights or around hazardous machinery.

At the hearing, the claimant testified that the main thing that keeps her from working is back problems and leg problems. The claimant said Dr. Hudgens has discussed surgery as a treatment option; however, in the CAP he recently completed, Dr. Hudgens said the claimant's condition will require physical therapy, medication and possible injections in the next year, and did not mention surgery. She has been treated with medication, Toradol injections, blocks and physical therapy; and Dr. Hudgens' records document that the claimant has responded well to this treatment.

Despite the claimant's complaints of severe pain, she has rated her pain between a 4-6/10 when seeing [] Dr. Hudgens in late 2009. Additionally, Dr. Hudgens['] treatment records reflect only mild abnormalities on physical exam. Dr. Hudgens wrote a letter on October 5, 2009, stating the claimant needed an ergonomic chair at work; and the claimant continued to work for around 11 months. In fact, the record reflects that the claimant has said she stopped working due to stress level rather than due to pain. The claimant had normal lumbar spine x-rays in September 2008. However, the September 2009, MRI findings showed a mild herniation at L5-S1 with mild encroachment; a subtle bilobed bulge at L3-4 with borderline narrowing; and a mild annular bulge at L4-5 creating borderline narrowing. The claimant was treated with an L5-S1 epidural in October 2009, but she did not have additional epidural blocks. The undersigned notes that the claimant's chiropractor, Dr. Crafton noted a severe reduction of range of motion in the cervical spine. However, Dr. Crafton also reported the claimant responded well to treatment. The claimant also had a right hip MRI arthogram, which Dr. Hudgens said was negative; and her right hip intermittently improved.

.      .      .

In terms of the claimant's alleged degenerative disc disease of the lumbar spine and cervical spine and herniated disc at L5-S1, the claimant has been treated with essentially routine and conservative treatment. Dr. Hudgens['] most recent visit reflects that the claimant has intermittently

had problems with her lower back, which was adequately controlled with medication. The undersigned finds that she is capable of sitting for 6 hours out of an 8-hour workday; standing for 2 hours out of an 8-hour workday; walking for 2 hours out of an 8-hour workday; remaining in the same position for 1 hour before needing a position change of at least 10 minutes before returning to the initial position, but could continue to work through this position change; lifting/carrying up to 10 pounds frequently; pushing and pulling arm and leg controls occasionally; stooping, kneeling, crouching, crawling, balancing and climbing ramps/stairs occasionally; and working in a job that would not require her to climb ladders, ropes or scaffolding or work at unprotected heights or around hazardous machinery. The PCE completed by Dr. Hudgens supports the residual functional capacity set forth above. In fact, the allowance of a change of position every hour is more limiting than the PCE provided by Dr. Hudgens, but this takes into account that the claimant will have flare-ups of back pain and will have some difficulty sitting or standing for prolonged periods of time as noted by Dr. Hudgens in Exhibit 2F.

The claimant has hypertension, which results in the limitation on her ability to perform simple, routine, repetitive tasks; adapt to infrequent/minimal changes in [the] workplace; and work in a job that would not require her to work at unprotected heights or around hazardous machinery. The claimant testified that her blood pressure is still fluctuating up and down; but it has gotten somewhat better since she quit her job.

In terms of the claimant's alleged hypertension, this condition has been shown to respond well to properly administered conservative treatment; and the record contains no indication of end-organ damage causing significant residual functional impairment of the heart, kidneys, and eyes, such as hypertensive cardiovascular disease, hypertensive nephropathy or retinopathy. The claimant had a normal stress test in February 2011. Dr. Burch stated the claimant's hypertension was uncontrolled due to stressful work conditions on October 4, 2010; however, Dr. Burch opined in November 2010[] that the claimant's hypertension alone is not going to be enough to warrant permanent medical disability. Dr. Burch also reported that the claimant's blood pressure was "great" by November 2010. The claimant later told Dr. Burch in August 2011, that her blood pressure was controlled at home. The residual functional capacity precludes working at unprotected heights and around dangerous machinery to account for her hypertension. The claimant has also been limited to simple, routine, repetitive tasks; thus, the claimant will only have to make simple work-related decisions to account for the multiple references that the claimant's hypertension was uncontrolled secondary to stressful work conditions.

.     .     .

The undersigned notes several references in the record to the claimant filing for unemployment benefits shortly after her alleged onset date when she resigned from her job, which is inconsistent with her allegation of total disability. At this time, she held herself out as ready, willing and able to work; and stated that she was actively seeking employment.

As for the opinion evidence, the undersigned gives great weight to Dr. Hudgens' PCE in Exhibit 31F and his recommendation of an ergonomic chair in Exhibits 2F and 15F. As noted above, the undersigned also added the allowance of a change of position every hour to account for the claimant's flare-ups of back pain and Dr. Hudgens' statement that she will have some difficulty sitting or standing for prolonged periods of time during flare-ups. Dr. Hudgens' CAP in Exhibit 24F is generally consistent with the PCE, as he noted that the claimant should not lift in excess of 25 pounds and should avoid twisting and bending. However, the undersigned notes that Dr. Hudgens' responses in the CAP are somewhat internally inconsistent, as he noted the claimant's pain and medication side effects will cause distraction from adequately performing activities or work; yet, physical activity would not prevent adequate functioning in these tasks. However, the limitation to simple, routine, repetitive tasks in the residual functional capacity addresses the claimant's alleged medication side effects and pain, as the claimant will not be making complex decisions or judgments. Dr. Hudgens also completed a disability parking pass form for the claimant in Exhibit 14F; however, he opined in the PCE that she is able to stand/walk for up to 2 hours in an 8-hour workday.

Great weight is given to Dr. Burch's opinion with regard to the fact that hypertension alone is not [] disabling and to her finding that the claimant was unable to work for 3 months in 2010 in Exhibit 6F, as this is consistent with the claimant's uncontrolled hypertension during that time. The undersigned notes that the remaining forms completed by Dr. Burch in connection with FMLA leave or unemployment benefits are consistent with her opinion.

.          .          .

The undersigned has considered evidence from "other sources," as defined in 20 CFR 404.1513(d) . . ., to show the severity of the individual's impairments and how they affect the individual's ability to function. These sources include, but are not limited to: medical sources who are "not acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists and therapists . . . . Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight

into the severity of the impairments and how they affect the individual's ability to function.

Less weight is given to Dr. Crafton's opinion in Exhibits 11F, 18F and 28F, as she is a chiropractor, which is considered another source under 20 CFR 404.1513(d). However, Dr. Hudgens is an acceptable medical source; and he specializes in orthopedics, which is what his opinion specifically addresses.

The record as a whole reflects that the claimant is capable of performing sedentary work as set forth above, and that she was not disabled for any 12 month period. There is little to no objective support for the claimant's assertion that her impairments are of disabling severity.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

.      .      .

**7.      The claimant was born on August 5, 1965 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).**

**8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

**9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

.      .      .

If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the undersigned asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to

perform the requirements of simple, repetitive, unskilled work. In order to compensate for the need to stand or change positions for around 10 minutes every hour, the vocational expert stated that she reduced the number of available jobs by 50% to account for the employers that would not allow the individual to work while changing positions. She identified appropriate representative occupations at the sedentary unskilled level, such as circuit board assembler (DOT 726.684-110), with approximately 205,325 available positions in the national economy and approximately 3,005 available positions in the State of Alabama; assembler (DOT 734.687-018), with approximately 115,225 available positions in the national economy and approximately 1,320 available positions in the State of Alabama; and bonder semiconductor of electronic components (DOT 726.685-066), with approximately 22,330 available positions in the national economy and approximately 140 available positions in the State of Alabama. The vocational expert stated that the numbers given were already reduced by 50%.

.    .    .

The claimant's representative asked the vocational expert whether the letter from Dr. Hudgens stating that she requires [a] special chair for lumbar support would affect the availability of the jobs identified above. The vocational expert responded that[,] technically, employers are supposed to accommodate those type of things[] but usually do not. Therefore, she reduced the number of jobs given by 50% to accommodate for the claimant's need for an ergonomic chair. However, the undersigned finds that a significant number of jobs remain.

.    .    .

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert confirmed that her testimony was consistent with the Dictionary of Occupational Titles except for the deviation in the numbers identified to account for the accommodation of an ergonomic chair and the need to change positions every hour.

Based on the record as a whole, including the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 10, 2010, through the date of this decision (20 CFR 404.1520(g)).**

(Tr. 25, 26, 28-29, 30, 31-32, 32-33, 33, 33-34, 34, 35, 36, 36-37, 37-38, 38, 38-39, 39, 40, 40-41, 41, 42-43, 43-44, 45, 46, 47 & 48 (internal citations omitted; emphasis in original).) The Appeals Council affirmed the ALJ's decision (Tr. 1-4) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. An ALJ, in turn,

> uses a five-step sequential evaluation to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Soc. Sec.*, 457 Fed. App'x 868, 870 (11th Cir. Feb. 9, 2012)[2] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f)); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted).

If a plaintiff proves that she cannot do her past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Id.* at 1237 & 1239;

---

[2] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

*Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those sedentary jobs identified by the vocational expert ("VE"), is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Tillman asserts one reason why the Commissioner's decision to deny her disability insurance benefits is in error (*i.e.,* not supported by substantial evidence), namely, that the ALJ's "residual functional capacity determination at the fifth step of the sequential evaluation process was not supported by substantial evidence and contradicts the opinions of Plaintiff's treating physician and

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

other treating sources." (Doc. 15, at 1-2; *see also id.* at 2-5.) In her brief and during oral argument, plaintiff's counsel made clear that it is Tillman's contention that the ALJ failed to assign an RFC consistent with the opinions of Drs. Hudgens, Burch, and Crafton and, therefore, the ALJ's RFC determination is not supported by substantial evidence.[4]

Initially, the Court notes that the responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her

---

[4]    Because the opinions of Drs. Hudgens, Burch and Crafton deal solely with plaintiff's physical impairments and limitations—namely, degenerative disc disease of the lumbar and cervical spines, herniated disc at L5-S1, and hypertension—"any potential arguments regarding the ALJ's assessment of h[er] [mental] limitations are waived and abandoned." *Land v. Commissioner of Social Security*, 494 Fed.Appx. 47, 49 n.1 (11th Cir. Oct. 26, 2012) (specifically referencing physical limitations), citing *Sepulveda v. United States Attorney General*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005). Indeed, plaintiff's counsel admitted during oral argument that she did not disagree with the mental limitations cited by the ALJ in her RFC determination. Besides, the mental limitations noted by the ALJ are supported by substantial evidence in the record. (*Compare* Tr. 29 (noting Tillman is capable of performing "**simple, routine, repetitive tasks; maintain attention and concentration for 2 hours at a time; have brief, superficial contact with [the] public; work in close proximity to others, but would need to work independently; and adapt to infrequent/minimal changes in [the] work place.**") *with* Tr. 284-286 (mental RFC assessment completed by reviewing psychologist Dr. Hope Jackson reveals, at best, moderate limitations in understanding and carrying out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, and the ability to respond appropriately to changes in the work setting; therefore, the reviewing psychologist determined the claimant has the ability to understand, remember, and carry out very short and simple instructions, attend for two-hour periods, have infrequent contact with the public, and work at a job where there would be infrequent changes in the workplace) *and* Tr. 347-348 (December 30, 2011 mental RFC assessment completed by Dr. Amanda Mumford reflects only moderate restriction of daily activities, specifically, driving, due to intermittent panic attacks and mild to moderate limitation in the ability to respond appropriately to customary work pressures).)

impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins, supra,* 457 Fed. Appx. at 870 n.5 (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)).  Here, the ALJ determined Tillman's physical RFC as follows: "**After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of sedentary work as defined in 20 CFR 404.1567(a), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific physical capabilities during the period of adjudication have been the ability to sit for 6 hours out of an 8-hour workday; stand for 2 hours out of an 8-hour workday; walk for 2 hours out of an 8-hour workday; remain in the same position for 1 hour before needing a position change of at least 10 minutes before returning to the initial position, but could continue to work through this position change; lift/carry up to 10 pounds frequently; push and pull arm and leg controls occasionally; and stoop, kneel, crouch, crawl, balance, and climb ramps/stairs occasionally.  The claimant could work in a job that would not require her to climb ladders, ropes or scaffolding; or work at unprotected heights or around hazardous machinery.**" (Tr. 28-29 (emphasis in original).)

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D.Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013)[5]; *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[6]

---

[5]     In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Id.* at 892.

[6]     It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue*, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. App'x at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ *could have* relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not (Continued)

In order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue,* 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases— include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003). In this case, however, there is a physical RFC assessment of record from plaintiff's treating orthopedist, Dr. Russell Hudgens, an assessment which is consistent with the RFC determination made by the ALJ. (*Compare* Tr. 368 *with* Tr. 28-29.)[7]

---

conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen,* 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

[7]     The Court does not mean to suggest that the ALJ's RFC determination was identical to that of Dr. Hudgens because it was not. However, as aforesaid, it is the ALJ's responsibility to make the RFC determination and this Court must uphold that determination if it is supported by substantial evidence. In the undersigned's opinion, part of the substantial evidence supporting the ALJ's RFC determination is Dr. Hudgens' January 24, 2012 PCE, wherein the treating orthopedist noted the following limitations during an 8-hour workday: (1) the ability to sit for 4 hours at one time and a total of 8 hours; (2) the ability to stand/walk for 2 hours at one time and a total of 2 hours; (3) the ability to lift and carry up to 5 pounds for 8 hours, 6-10 pounds for 6 hours, and 11-20 pounds for 2 hours; (4) the ability to use the arms and hands for repetitive action such as simple grasping, pushing/pulling arm controls, and fine manipulation; (5) the ability to use the legs and feet for repetitive action such as pushing/pulling of leg controls; (6) the ability to bend, squat, climb and reach for 2 hours each and crawl 1 hour; and (7) no restriction on activities involving unprotected heights, working (Continued)

Importantly, in establishing Tillman's RFC, which means determining Tillman's "remaining ability to do work despite [his] impairments[,]" *Packer*, 542 Fed.Appx. at 891—keeping a focus on the extent of those impairments as documented by the credible record evidence—the ALJ sifted painstakingly through the medical evidence of record (*see* Tr. 30-42), along with the claimant's testimony (*see* Tr. 29-30, 42, 43, 44 & 45), to conclude that "[t]he record as a whole reflects that the claimant is capable of performing sedentary work as set forth above, and that she was not disabled for any 12 month

---

around moving machinery, etc. (Tr. 368). Certainly, the ALJ's lifting and carrying determination (*see* Tr. 28-29 (finding plaintiff can lift and carry up to 10 pounds frequently)) is consistent with Dr. Hudgens' findings (*see* Tr. 368 (reflecting plaintiff can lift and carry up to 10 pounds for 6 hours out of an 8-hour workday)), *see* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."), as are the limitations relating to pushing and pulling of arm and leg controls (*compare* Tr. 29 (ALJ limited plaintiff to occasional pushing and pulling of arm and leg controls) *with* Tr. 368 (no limitations noted by Dr. Hudgens)) and stooping, kneeling, crouching, etc. (*compare* Tr. 29 (ALJ limits plaintiff to occasional stooping, balancing, climbing stairs and ramps, etc.) *with* Tr. 368 (plaintiff can bend, squat, climb and reach for 2 hours each out of an 8-hour workday and crawl 1 hour out of an 8-hour workday). *See* SSR 83-10 ("By its very nature, work performed primarily in a seated position entails no significant stooping."). Moreover, the ALJ explained in detail why she found plaintiff significantly limited in relation to working around unprotected heights and moving machinery (*compare* Tr. 29 *with* Tr. 44), in contrast to Dr. Hudgens' findings that plaintiff had no restrictions on activities involving unprotected heights and being around moving machinery (Tr. 368). Finally, even if the claimant can only stand and walk 2 hours total out of an 8-hour workday (Tr. 368), as opposed to 2 hours each out of an 8-hour workday (Tr. 28 (finding plaintiff can stand 2 hours out of an 8-hour workday and walk 2 hours out of an 8-hour workday)), any error by the ALJ in this regard is harmless inasmuch as Dr. Hudgens' PCE fully accounts for plaintiff's ability to sit for at least 6 hours out of an 8-hour workday and stand and/or walk for 2 hours out of an 8-hour workday (Tr. 368). In other words, the sitting, standing, and walking limitations noted by Dr. Hudgens are fully consistent with the ALJ's determination that plaintiff can perform sedentary work, *compare* 20 C.F.R. § 404.1567(a) ("Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.") *with* SSR 83-10 ("'Occasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours out of an 8-hour workday.")), and plaintiff has come forward with no evidence that the jobs identified by the VE at the administrative hearing (*see* Tr. 75) would necessarily require her to perform more than 2 hours of standing and walking out of an 8-hour workday or, conversely, less than 6 hours of sitting out of an 8-hour workday.

period."[8] (Tr. 46.) Indeed, after setting out the important evidence of record regarding plaintiff's degenerative disc disease of the lumbar and cervical spines, herniated disc at L5-S1, and hypertension, as well as plaintiff's testimony, the ALJ then stated the following: "In terms of the claimant's alleged degenerative disc disease of the lumbar spine and cervical spine and herniated disc at L5-S1, the claimant has been treated with essentially routine and conservative treatment. Dr. Hudgens['] most recent visit reflects that the claimant has intermittently had problems with her lower back, which was adequately controlled with medication. The undersigned finds that she is capable of sitting for 6 hours out of an 8-hour workday; standing for 2 hours out of an 8-hour workday; walking for 2 hours out of an 8-hour workday; remaining in the same position for 1 hour before needing a position change of at least 10 minutes before returning to the initial position, but could continue to work through this position change; lifting/carrying up to 10 pounds frequently; pushing and pulling arm and leg controls occasionally; stooping, kneeling, crouching, crawling, balancing and climbing ramps/stairs occasionally; and working in a job that would not require her to climb ladders, ropes or scaffolding or work at unprotected heights or around hazardous machinery. The PCE completed by Dr. Hudgens supports the residual functional capacity set forth above. In fact, the allowance of a change in position every hour is

---

[8] This latter statement is important because the ALJ accorded great weight to Dr. Burch's determination that the claimant was unable to work for 3 months in 2010 due to uncontrolled hypertension. (*See* Tr. 45; *compare id. with, e.g.*, Tr. 230-231 & 241-244.) However, 3 months of inability to work does not establish a compensable disability since 12 months is needed. *See* 42 U.S.C. § 423(d)(1)(A) ("The term 'disability' means [] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"). Indeed, as Dr. Burch also noted, plaintiff's hypertension alone is not sufficient to establish permanent medical disability. (Tr. 252 ("I do not think her hypertension alone is going to be enough to warrant permanent medical disability.").)

more limiting than the PCE provided by Dr. Hudgens, but this takes into account that the claimant will have flare-ups of back pain and will have some difficulty sitting or standing for prolonged periods of time as noted by Dr. Hudgens in Exhibit 2F. . . . In terms of the claimant's alleged hypertension, this condition has been shown to respond well to properly administered conservative treatment; and the record contains no indication of end-organ damage causing significant residual functional impairment of the heart, kidneys, and eyes, such as hypertensive cardiovascular disease, hypertensive nephropathy or retinopathy. The claimant had a normal stress test in February 2011. Dr. Burch stated the claimant's hypertension was uncontrolled due to stressful work conditions on October 4, 2010; however, Dr. Burch opined in November 2010[] that the claimant's hypertension alone is not going to be enough to warrant permanent medical disability. Dr. Burch also reported that the claimant's blood pressure was "great" by November 2010. The claimant later told Dr. Burch in August 2011, that her blood pressure was controlled at home. The residual functional capacity precludes working at unprotected heights and around dangerous machinery to account for her hypertension. The claimant has also been limited to simple, routine, repetitive tasks; thus, the claimant will only have to make simple work-related decisions to account for the multiple references that the claimant's hypertension was uncontrolled secondary to stressful work conditions." (Tr. 43 & 44.) This analysis shows to this Court that the ALJ considered Tillman's physical condition as a whole in determining her physical RFC. Accordingly, the ALJ's physical RFC determination provides an articulated linkage to the medical evidence of record. The linkage requirement is simply another way to say that, in order for this Court to find that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC. *See, e.g.,*

*Hanna*, 395 Fed. Appx. at 636 (an ALJ's "decision [must] provide a meaningful basis upon which we can review [a plaintiff's] case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*, 542 Fed.Appx. at 891-892 (an ALJ must "provide *enough reasoning* for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole[]" (emphasis added)). Thus, by "showing her work" (*see, e.g.*, Tr. 43 & 44), the ALJ has provided the required "linkage" between the record evidence and her RFC determination necessary to facilitate this Court's meaningful review of her decision.[9]

---

[9] The undersigned reiterates that the ALJ gave great weight to Dr. Hudgens' January 24, 2012 PCE and correctly afforded "less weight" to the opinions set forth by plaintiff's chiropractor, Dr. Crafton (Tr. 46). Chiropractors are excluded from the list of "acceptable medical sources" whose opinions are to be considered in determining the existence of an impairment. *See* 20 C.F.R. § 404.1513(a) (2013). However, medical sources who are not "acceptable medical sources" are considered "other sources" and their opinions and evidence may be used "to show the severity" of an impairment and "how it affects [the] ability to work[.]" *See* 20 C.F.R. § 404.1513(d) (chiropractors included in subsection (1)).

Social Security Ruling 06-03p clearly provides that the factors listed in 20 C.F.R. § 404.1527(d) can be applied to opinion evidence from medical sources who are not "acceptable medical sources," including the following factors: (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) how consistent the source's opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support the opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the source's opinion. *Id.* The ruling goes on to explain that not every factor listed will apply in every case. *Id.* And, finally, the ruling explains that the "adjudicator generally should explain the weight given to opinions from [] 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a . . . subsequent reviewer to follow the adjudicator's reasoning . . . ." *Id.*

In this instance, this Court discerns no error with the ALJ affording greater weight to Dr. Hudgens' PCE over the opinions of Dr. Crafton (*see* Tr. 46 ("Less weight is given to Dr. Crafton's opinion in Exhibits 11F, 18F and 28F, as she is a chiropractor, which is considered another source under 20 CFR 404.1513(d). However, Dr. Hudgens is an acceptable medical sources; and he specializes in orthopedics, which is what his opinion specifically addresses.")), particularly since the chiropractor did not supply her own PCE or otherwise succinctly explain how plaintiff's lumbar and cervical spine impairments affect her ability to work (*see, e.g.*, Tr. 289-291, 329 & 349).

Because substantial evidence of record supports the Commissioner's determination that Tillman can perform the physical and mental requirements of a reduced range of sedentary work as identified by the ALJ (*see* Tr. 28-29),[10] and plaintiff makes no argument that this residual functional capacity would preclude her performance of the sedentary jobs identified by the VE during the administrative hearing (*compare* Doc. 15 *with* Tr. 47 & 75), the Commissioner's fifth-step determination is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security*, 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a VE[.]"(internal citations omitted)); *Land v. Commissioner of Social Security*, 494 Fed.Appx. 47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden." (internal citations omitted)).

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner

---

[10]     The undersigned need note that the objective examination findings of Dr. Hudgens and Dr. Burch support the ALJ's RFC determination. (*See* Tr. 241-247, 251-258, 305-317, 327 & 340-341.)

of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 13th day of June, 2014.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**